609 So.2d 644 (1992)
METROPOLITAN DADE COUNTY, Appellant,
v.
COSCAN FLORIDA, INC., and State of Florida, Department of Environmental Regulation, Appellees.
Nos. 90-784, 90-2383.
District Court of Appeal of Florida, Third District.
October 13, 1992.
Robert A. Ginsburg, County Atty., and Patrick Casey, Asst. County Atty., for appellant.
Haben & Culpepper, P.A. and Robert C. Apgar, Patricia E. Comer, Tallahassee, for appellees.
Before NESBITT, BASKIN and COPE, JJ.
PER CURIAM.
Metropolitan Dade County, an intervenor below in the administrative action between Coscan Florida, Inc. (formerly Costain Florida, Inc.) and the Florida Department of Environmental Regulation (DER), appeals from a final order granting a dredge and fill permit to Coscan to expand an existing *645 marina at its residential development from 99 slips to 346 slips. We reverse.
Coscan is the owner of The Waterways development in north Dade County. The area was first dredged and filled in the late 1960's by the Sunny Isles Reclamation District. Since then, there has been extensive dredging and filling to create waterfront property along the Intracoastal Waterway both to the north and south of the development. The land around the marina was undeveloped when Coscan acquired it in 1981.
The Waterways main boat basin was already in existence at the time Coscan acquired the property. The basin covers about 21 acres and is bulkheaded. An entrance channel connects the Intracoastal Waterway with the marina basin. The third water body in this development is a finger canal along the northern boundary of the property. It, too, is bulkheaded. The marina is located far from unobstructed ocean access. It is approximately five miles north of Baker's Haulover, the nearest inlet to the Atlantic Ocean in Dade County, and eight to nine miles south of an inlet to the Atlantic Ocean at Port Everglades in Broward County. The proposed expansion would add four main piers of 71 finger slips in the marina basin, 31 slips in the entrance channel and 48 marginal docks in the north canal.
Coscan applied for a dredge and fill permit in March, 1986, along with an application for a proposed development of regional impact[1] to expand the marina at The Waterways into a commercial operation open to the public. In 1987, DER initially issued a notice of intent to deny the dredge and fill permit based on the already existing water quality violations in the basin and concerns about the marina expansion's impact on the West Indian manatee, a species classified as endangered under section 4 of the Endangered Species Act.[2] Coscan requested an administrative hearing challenging the intent to deny.
Shortly before the cases[3] were to be heard, Coscan and DER entered into a stipulation of settlement. The settlement called for phased construction with extensive hydrographic, water and sediment quality monitoring. Construction of each phase of the marina would be contingent upon the success of a one year monitoring program that begins after each phase of the marina is 80 percent occupied.[4] Failure to meet the evaluation criteria set out in the stipulation would result in the removal of slips constructed during the most recent construction phase. The settlement also provided procedures for protection of manatees during construction and for protection of manatees in the basin during later operation of the expanded marina. Based *646 on this agreement, DER issued a notice of intent to issue the dredge and fill permit.
Dade County intervened in the DER administrative process in 1987. After the cases were consolidated and DER issued its notice of intent to issue the dredge and fill permit, Dade County became the petitioner opposing the issuance of the permit. The consolidated administrative hearing was held in May and June, 1988. Extensive testimony was taken from numerous experts and hundreds of documents were presented to the hearing officer. The hearing officer recommended approval of the permit under the terms of the settlement stipulation, with some further conditions to protect water quality and the manatees. On March 9, 1990, DER adopted the hearing officer's recommended order and issued its final order approving the dredge and fill permit, again with some modifications. Dade County appealed the final agency action approving the permit.
Dade County argues that the stipulation of settlement approved by DER is an unlawful experiment with already degraded water quality in the proposed expansion area. It asserts that DER's decision to allow the project to go forward is contrary to section 403.918, Florida Statutes (1987), which requires that (1) there be reasonable assurance that water quality standards will not be violated and (2) the project is not contrary to the public interest. On the record now before us, Dade County's position has merit.
The burden of showing entitlement to a permit is on the applicant, in this case, Coscan. See Department of Transportation v. J.W.C. Co., 396 So.2d 778, 787-90 (Fla. 1st DCA 1981).
Section 403.918, Florida Statutes (1987), requires the applicant to make essentially two showings in order to qualify for a permit. First, the applicant must provide "the department with reasonable assurance that water quality standards will not be violated." Id. § 403.918(1). In the present case there are violations of existing water quality standards for dissolved oxygen and copper. That being so, the applicant must show that the proposed activity will not cause a material worsening of the existing violations, and that the proposed activity will not introduce new violations.
Second, insofar as pertinent here, the applicant must provide "the department with reasonable assurance that the project is not contrary to the public interest." Id. § 403.918(2). The statute enumerates specific factors to be considered in determining whether the project is, or is not, contrary to the public interest. Id. § 403.918(2)(a).
Under this "public interest" standard, the statute also provides in part, "[i]f the applicant is unable to meet water quality standards because existing ambient water quality does not meet standards, the department shall consider mitigation measures proposed by or acceptable to the applicant that cause net improvement of the water quality in the receiving body of water for those parameters which do not meet standards." Id. § 403.918(2)(b).
The principal water quality violation is that the marina basin and north canal do not meet state standards for dissolved oxygen. There is little horizontal movement of the water in and out of the marina with the tides. There is slow flushing action, that is, it requires an extended period of time for the marina basin and north canal to exchange their water with the waters of Biscayne Bay.[5] The basin is 40 to 45 feet deep, and the water stratifies, with the denser, more oxygen-depleted water being at the lower levels.
The hearing officer found that the flushing times are important in the evaluation of a proposed marina expansion on water quality. "The flushing time of the marina basin and the canal controls whether pollutants discharged by boating activities will accumulate and degrade water quality or move quickly out of the marina and canal and dissipate." (Recommended Order, at 16).
*647 Coscan's proposed solution for the dissolved oxygen problem is to install an aeration system which will break up the stratification and increase flushing. The system, as described by the hearing officer, will release air deep in the water which will create a buoyant column of air bubbles that will mix the denser, heavier water on the bottom with the lighter surface water as the air rises to the surface. This type of system both mixes the water at different levels by the rising motion of the bubbles and adds oxygen to the water on the surface of the bubbles. The differences in densities will induce density currents which should also improve the exchange of water between the Intracoastal Waterway and the basin.
We find that, in recommending this project for approval, the hearing officer misapprehended the legal standard pertaining to water quality. In the findings of fact, the hearing officer stated in part:
It is unnecessary to project in these findings of fact whether the mixing will be sufficient to meet state water quality standards, for the Stipulation of Settlement the Department has reached with Coscan makes such projection unnecessary. The phased construction and monitoring will allow an actual determination of whether the predicted increase in water quality will occur. Without this agreement, the evidence presented would not be sufficient to provide adequate assurances that water quality will not be degraded by the project. The size of the area to be aerated here is much greater than that which the manufacturer of the aeration system has dealt with before. It also remains to be demonstrated whether the suspension of the diffusers for the system as planned will resuspend the fine sediment at the bottom of the basin. Such resuspension would decrease water quality and reduce the penetration of light required for plant and animal communities in the upper levels of the basin... . The resuspension of sediment might also increase the level of lead, zinc and perhaps copper in the waters, resulting in a violation of water quality standards. The design of the proposed aeration system has a sufficient possibility of operating successfully that it is reasonable to permit the activity because the applicant has proposed the phased construction of the marina improvements, with the condition that phases will be removed if water quality standards are violated by any phase of the expansion or if a phase results in a decline in water quality. This agreement provides reasonable assurance that the project will not be contrary to the public interest.
(Recommended Order, at 19-20) (emphasis added).
Similarly, in the conclusions of law the hearing officer stated:
Section 403.918(1), Florida Statutes (1987), requires that an applicant provide "reasonable assurance that water quality standards will not be violated." Ordinarily, the applicant must show that violation of water quality standards would not be likely under the worst reasonably foreseeable conditions... . This case is unusual, however, because the Stipulation of Settlement entered into by the Department and Coscan does not make it necessary to project now the likely effect on water quality as phases are constructed. Should water quality standards be violated at any time, after a period for correction, the project would not be continued, and portions of the project which resulted in the water quality violation would be removed. The provisions of the settlement agreement themselves provide reasonable assurance that water quality standards will not be violated by the project. That does not mean that the terms of the Settlement Agreement, per se, meet the requirements of section 403.918(1), Florida Statutes (1987). Rather, at this point, the question is whether there is a sufficient likelihood that water quality conditions will not be violated, so that it is reasonable to give Coscan the opportunity to phase its construction and demonstrate that the project will meet applicable standards. If there were little or no reason to believe that the project would *648 be able to meet the standards, the project should be denied, but that is not the case here.
... .
... Coscan's evidence is persuasive that it is sufficiently likely that violations will not occur to permit the rigorous monitoring program set out in the Stipulation of Settlement. The same may be said for the requirements of Rule 17-3.121, Florida Administrative Code, which sets requirements in class III waters for bacteriological quality, cadmium, cooper, dissolved oxygen, and other substances.
(Recommended Order, at 33-35) (citation omitted; emphasis added).
We disagree with so much of the order as indicates that it is not necessary for the hearing officer to analyze at this time the anticipated effects of the proposed project. In principle there is nothing wrong with the provisions in the Settlement Agreement which call for removal of the most recent phase of the marina project if water quality standards are violated. We do not think that such an agreement can, however, substitute for analyzing the project prior to implementation to determine whether the applicant's proposed system provides reasonable assurance that it will meet the requisite water quality standards. Here, the hearing officer and agency simply bypassed making a determination on whether the applicant had made the necessary showing of reasonable assurance, reasoning instead that any future water quality violation could be cured by dismantling portions of the project. We do not think that the statute allows the agency to proceed without an analysis, in advance, of (1) the likely effects of the project and (2) the question whether the applicant has provided reasonable assurance that water quality standards will be met.
In our view, the statute is intended to prevent the degradation of existing water quality, and to ameliorate existing violations. If a full scale project proceeds where there is only a mere possibility of successful implementation, that exposes the water body to the risk that water quality violations will most likely result and persist for some period of time before the last phase of the project is removed. Such a scenario falls short of the reasonable assurance contemplated by the statute. "Reasonable assurance" contemplates, in our view, a substantial likelihood that the project will be successfully implemented.
The hearing officer in the present case used varying terminology to describe the prospects for the Coscan proposal. In the portions of the Order quoted above, the hearing officer commented that the evidence did not provide adequate assurance of water quality but that the project had a "sufficient possibility of operating successfully that it is reasonable to permit the activity... ." (Recommended Order at 19, 20). Elsewhere, the hearing officer said that it was "likely" that water quality violations will not occur. (Recommended Order, at 35).
We conclude that the hearing officer must examine the applicant's proposal to determine at this time whether the project provides the necessary reasonable assurance called for by the statute. The "removal agreement" contained in the Coscan-DER settlement is one factor which can be considered, but it cannot substitute for an effort to project at this stage what the effects of the proposed project will be.[6] The statute is prohibitory: it requires reasonable assurances before the project is started that water quality in the affected area will not be violated. It is not within the hearing officer's province to allow a developer to proceed with a project of this magnitude with no idea as to what the effect on water quality will be.
Coscan argues that it has, in fact, provided all of the assurances which are required under the statute and that there is evidence in the record which supports its position on the water quality issue. It may well be *649 that on remand Coscan will persuade the hearing officer on this point. The problem, however, is that the hearing officer expressly disclaimed any effort to determine whether Coscan's proposal provided the required reasonable assurance regarding water quality. There must, therefore, be further proceedings on the water quality issue.
Dade County also argues that the hearing officer erred by determining that the project would not have an adverse impact on the local manatee population, an endangered species. We agree and reverse for this additional reason.
Florida law sets forth an explicit standard to be applied in evaluating impact on fish and wildlife, including endangered species and endangered species habitats. Section 403.918, Florida Statutes, provides in part:
(2) A permit may not be issued under ss. 403.91-403.929 unless the applicant provides the department with reasonable assurance that the project is not contrary to the public interest... .
(a) In determining whether a project is not contrary to the public interest, or is clearly in the public interest, the department shall consider and balance the following criteria:
.....
2. Whether the project will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats... .
Id. § 403.918(2)(a)(2) (emphasis added).
The question, therefore, is whether the proposed project will adversely affect the endangered species or its habitat. The hearing officer concluded that this standard would not be violated by the project. We conclude that the hearing officer misinterpreted the legal standard.
The Florida Department of Natural Resources (DNR) opposed issuing a permit for this project. Based on existing information about the endangered species, DNR concluded that the addition of 250 large power boats to this marina would cause additional collisions with manatees and adversely affect the already limited population, which reproduces at a low rate.[7] DNR also opposed the project because it violated DNR's existing siting criteria for marinas.
The hearing officer found that there are approximately 600 manatees in the east coast area of Florida and the small size of the population makes it important to minimize manatee morbidity and mortality. The hearing officer's findings of fact stated that, while data on the distribution of the manatees in the area of the marina are scarce, it was known that the manatees use the Intracoastal Waterway as a migratory corridor from Port Everglades to Biscayne Bay. Port Everglades is a congregating area for manatees, especially in winter, because of the warm waters. The animals feed on the sea grasses in Biscayne Bay. The area from Biscayne Bay north to Maule Lake, two miles south of the Coscan marina, has been designated a manatee critical habitat. The critical habitat designation is to protect primary food resources for the manatees. The migration corridor must be kept open to facilitate genetic exchange in the manatee population. The additional boat traffic generated by this marina will cross the migratory area.
The hearing officer found that one of the greatest threats to the manatee is from propellers of large vessels with inboard motors. The hearing officer found that the 250 additional berths in the proposed marina "are designed for boats in the 40 to 60 foot range, which are the type of boat often known as `express cruisers.' These are planing hull boats which are attractive to their owners because of their speed." (Recommended Order, at 28).[8] The hearing *650 officer estimated that the marina "would account for a 58 percent increase in traffic by boats larger than 26 feet." (Recommended Order, at 29).
The hearing officer found that the project would tend to increase power boat collisions with manatees. The recommended order stated, "Certainly the addition of up to 250 power boats adjacent to the Intracoastal Waterway, which is the migratory highway for the manatees, poses some incremental threat to the manatee population." (Recommended Order, at 26). Relying on a 1987 U.S. Fish and Wildlife Service biological report, however, the hearing officer stated that
[t]he determination from the U.S. Fish and Wildlife Service that the project will not jeopardize the continued existence of the manatee is also persuasive evidence that any incremental impact of the project on the manatee is acceptable. Coscan has proven that the project is not contrary to the public interest by adversely affecting the conservation of wildlife, especially the West Indian manatee.
(Recommended Order, at 39) (emphasis added).
The problem is that the hearing officer treated the state and federal endangered species standards as being equivalent, when they are not. The U.S. Fish and Wildlife Service report was written pursuant to the federal statutory standard contained in the federal Endangered Species Act.[9] As explained by the author of the federal report, David Wesley:
Biological opinions are written under Section 7 of the Endangered Species Act.[[10]] There are guidelines and regulations that have been published which direct the Service on what we can and can't do with regard to statements that we issue under biological opinions. The ultimate result of a biological opinion is either it is likely to jeopardize the continued existence or it is not likely to jeopardize the continued existence. There isn't any happy medium in between if you will. We have to make the call is it jeopardy or no jeopardy. That was the way the law was set up, and that's the way the regulations were implemented.
.....
... It's a difficult decision to make, but on this case we had to make the decision that it was not jeopardy based upon the size of the project and the information that we had about manatee movements and manatee mortality distribution at the time.
(Dade Cty. Ex. 359, Wesley depo. pp. 10, 11) (emphasis added).[11] Thus, under the federal standard the question is whether the project will jeopardize the continued existence of the endangered species.
The Florida standard is different, and confers greater protection on endangered species than does federal law. Under Florida law, the question is whether the project will adversely affect the endangered species or its habitat. If the proposed project will have an adverse effect on the endangered species or its habitat, then the standard is violated. That is so even if the adverse effect is not so great as to jeopardize the continued existence of the species.
Because an incorrect legal standard was applied, we remand for further proceedings and new findings on the question of adverse effect on the endangered species and its habitat.[12] The burden is on the applicant to show entitlement to the permit.[13] *651 If, as now appears, the present Coscan proposal will adversely affect manatees or their habitat, the hearing officer should also address the imposition of conditions which can avoid that risk. We note that restricting the marina expansion to sailboats is one such mechanism,[14] and there may be others.
For the reasons stated, the order under review is reversed and the cause remanded for further proceedings consistent herewith.
NOTES
[1] The application for a development of regional impact (DRI) was denied by two separate resolutions of the Board of County Commissioners for Dade County on March 9, 1987. The denial was appealed both to the Dade County Circuit Court and to the Governor and Cabinet sitting as the Florida Land and Water Adjudicatory Commission (FLWAC). The Third District Court of Appeal refused to abate the circuit court proceedings pending consideration of the matter by FLWAC and ruled that jurisdiction lay within the province of both the court and FLWAC. Costain Florida, Inc. v. Metropolitan Dade County, 528 So.2d 35 (Fla. 3d DCA 1988). The application for the DRI was later denied by FLWAC. That denial was appealed to the First District Court of Appeal, which affirmed the denial in Coscan Florida, Inc. v. Metropolitan Dade County, 586 So.2d 80 (Fla. 1st DCA 1991). The district court found that the proposed expansion of the marina would conflict with the normal and expected use of the existing neighborhoods and would also violate the Dade County Comprehensive Development Master Plan. Thus, the issue of the denial of the DRI is not before us. The First District Court of Appeal's opinion also renders moot the issue presented in Coscan's cross-appeal in this case.
[2] 16 U.S.C. § 1533 (1973 as amended) and 50 C.F.R. § 17.95.
[3] The application for the DRI, already denied by Dade County, was consolidated in December, 1987 with the request for the dredge and fill permit, which DER announced it intended to deny, for a single administrative hearing.
[4] The agreement allows Coscan to construct 31 slips in the entrance channel regardless of whether there is any improvement in water quality in the marina basin itself. The hearing officer found that the flushing time in the entrance channel was sufficient to keep the water quality from being degraded by the additional boats.
[5] The hearing officer found that the flushing time for the marina was 11.5 days, compared with the federal Environmental Protection Agency's recommended guideline of two to four days for marinas. (Recommended Order, at 16).
[6] We do not say that the statute prohibits the use of new technologies for the improvement of water quality, but there must be an analysis of such a system and its likelihood of success. In the present case, however, the proposed marina use is not an unusual one. While the aeration system may be unusual in its size, such systems are in use elsewhere.
[7] Additionally, DNR pointed out that the migratory data for manatees in this area was limited, and recommended a one-year study to provide a better data base on which to make a decision. See infra note 13.
[8] By contrast, sailboats pose very little risk to manatees because of sailboats' "slow speeds and the protected position of their propellers." (Recommended Order, at 25).
[9] 16 U.S.C. § 1531 et seq. (1973), as amended.
[10] 16 U.S.C. § 1536 (1973), as amended.
[11] Although the hearing officer relied heavily on the U.S. Fish and Wildlife Service report, that report was based on January, 1986 data. The author of the report testified that by 1988 there had been a significant increase in the number of manatee deaths.
[12] The existing findings can be read to establish that the proposed project will adversely affect the endangered species, but we believe the better course is to remand for further findings in light of the correct legal standard.
[13] Although DNR opposed the permit on the basis of the information known about the endangered species, both DNR and the U.S. Fish and Wildlife Service preferred to conduct a detailed study of migratory patterns in the immediate area in order to assemble a more detailed data base on which to make a recommendation. Coscan was asked to participate and refused that option.
[14] See supra note 8.