IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

ST. JOHNS RIVER WATER MANAGEMENT
DISTRICT AND CEDAR ISLAND HOMEOWNERS'
ASSOCIATION OF FLAGLER COUNTY, INC.,

    Petitioners,

v.

                                      Case No.  5D22-2426
                                      LT Case Nos. 21-3391
                                                2021-33

EDWARD J. CECE AND ANNA M. CECE,

    Respondents.

_____/

Opinion filed August 11, 2023

Petition for Review of Nonfinal
Administrative Action,
A Case of Original Jurisdiction.

Jessica P. Quiggle and Steven J.
Kahn, of, for Petitioner, St. Johns River
Water Management District.

Jay W. Livingston, of Livingston &
Sword, P.A., Palm Coast, for Petitioner,
Cedar Island Homeowners' Association
of Flagler County, Inc.

Edward J. Cece and Anna M. Cece,
Flagler Beach, pro se.

EDWARDS, C.J.,

<u>On Motion for Written Opinion</u>

We previously denied the Joint Petition for Review of Non-Final Agency Action filed by Petitioner, St. Johns River Water Management District ("the District"), and Petitioner, Cedar Island Homeowners' Association of Flagler County, Inc. ("the HOA"; while "the development" or "Cedar Island" refers to the subdivision the HOA controls) relating to the Administrative Law Judge's ("ALJ") Order Following Remand dated September 9, 2022. The underlying case dealt with a stormwater management system permit, the Dash 9 Permit,[1] sought by the HOA from the District, which would increase the permissible allowable impervious surface area,[2] within the development

---

[1] The development's stormwater management system was originally authorized by the District's Permit 70686-1 in 2001. Subsequent permits have been issued by the District to transfer ownership of the stormwater management system to another developer and ultimately to the HOA. Each amended permit bears the same first five digits, and only the digit after the dash changes, hence the reference to Permit 70686-4 as the Dash 4 Permit, the fourth amended permit, which was issued in 2005 and transferred the operation and maintenance of the stormwater management system to the HOA. The Dash 9 Permit (Permit 70686-9) would be the ninth permit for this system and it would amend the Dash 4 Permit if granted.

[2] Impervious surfaces are artificial surfaces that water cannot naturally percolate through or penetrate. Concrete sidewalks and patios, asphalt paved roads, metal, and roofing shingles are examples of impervious surfaces. Water striking an impervious surface will run off, potentially causing damage such as flooding or pollution if not properly managed.

2

to 44.28% from the originally permitted 38.06%.  We grant the District's motion for a written opinion, but we still deny the petition for the reasons set forth below.

## Development Status of Cedar Island

Cedar Island was developed as a 32-lot residential subdivision.  As of December 2021, shortly before the underlying February 2022 formal administrative hearing, 18 homes had been fully constructed, three were under construction, and 11 lots were undeveloped.  Some lot owners of Cedar Island were concerned that continued development and building in the subdivision would increase the impervious surface area beyond what the stormwater system could manage and for which it had been permitted.  Those owners worried that continued development might result in flooding within the subdivision among other problems.

## Cedar Island's Stormwater Management System

The development's stormwater management system consists of two interconnected, wet detention ponds (A and B) together with a series of 25-foot-wide vegetative natural buffers ("VNB") located within a conservation easement running along the rear of many lots in the development.  The

---

Increasing the amount of impervious surfaces through continued development of the subdivision will increase the volume of stormwater runoff that must be handled by Cedar Island's stormwater management system.

3

detention ponds perform two functions: treatment and storage of stormwater runoff. A simplified explanation of treatment is that the longer dirty stormwater remains in one of the detention ponds, the cleaner it gets, as particulates and sediments suspended in the water tend to descend to and remain near or on the bottom of the pond.

The ponds also store water to avert flooding, a direct function of their volume. Once the ponds are full, they begin releasing water in a desirable direction through an opening at the upper edge of the pond called a weir. The effective storage volume of each detention pond is determined by its dimensions, including its depth, and by the height at which the weir is located together with the size of the weir. All things being equal, the lower the elevation of the weir, the sooner water will be released, while the wider the opening of the weir, the greater flow of water will be released. The treatment and storage functions of the ponds work together to limit pollution and flooding caused by stormwater running off impervious surfaces within the development.

<u>Dash 9 Permit Involved Re-Calculations Only</u>

In its 2020 application for the Dash 9 Permit, the HOA did not say or propose that it was going to make any physical changes to the structure or composition of the existing stormwater management system, nor did the

4

District require alterations as a condition for issuance of the permit. Instead, the HOA simply submitted a recalculation, performed by its retained engineering expert, purporting to demonstrate that the stormwater system as designed and permitted in 2001 could effectively manage an increased load associated with a greater amount and percentage of impervious surface area which would generally mean more stormwater runoff that wouldn't soak into green spaces but would go to the existing stormwater system. The HOA's engineering expert did not base any of his calculations on the existing system.

## What Did They Know, and When Did They Know It?

As part of its application for the Dash 9 Permit, the HOA submitted certain as-built plans created in 2002 when Cedar Island's stormwater management system was actually constructed. Those as-built plans demonstrated that the stormwater management system, as actually constructed, deviated in several significant ways from the originally permitted design. For example, the detention ponds were considerably shallower than designed. Pond A was constructed to a depth between -4.2 to -4.7 feet, instead of the designed -6 feet. Pond B was constructed to a depth of -4.3 feet instead of the designed -8 feet. The crested elevation of the weir was constructed several inches lower than designed and the weir itself was

5

constructed to a width of only 24 feet instead of 40 feet as set forth in the design of the originally permitted system. These as-built deviations, individually and in combination, decrease the amount of stormwater which the development's stormwater management system could effectively handle, compared to the system as it was designed and originally permitted in 2001. No current survey of the components of the stormwater management system was provided by anybody. Inexplicably, the HOA's expert testified that he was unaware of any differences between the current system and the as-designed system. All his calculations were based solely on the non-existent, as-designed stormwater management system. The HOA possessed the as-built plans all along; thus, the construction shortfalls cannot be considered a surprise to the HOA or the District as though it happened to come up sometime late in the process.

Additionally, in connection with the HOA's application for the Dash 9 Permit, the District conducted an inspection of Cedar Island's existing stormwater management system and found several compliance issues, such as (1) accumulation of sediment in both detention ponds; (2) erosion of the top of the berm elevation for both ponds; and (3) numerous areas where the series of 25-foot wide VNBs had been cleared or modified, which reduced their performance. The District considered those three items to be curable

by maintenance-type actions. The District noted that the HOA could undertake compliance with the maintenance issues on a parallel basis and time frame with applying for the increased percentage of impervious surfaces. The District's Technical Staff also noted that some of the homes included an impervious footprint larger than accounted for in the original design. Thus, the HOA and District knew well before the administrative hearing that the existing system and the as-designed system were remarkably different in many structural and functional regards.

Objections to Issuance of the Dash 9 Permit

Two Cedar Island owners opposed issuance of the Dash 9 Permit based primarily on their concern that continued development could overwhelm the development's stormwater management system and result in problems. They requested an administrative hearing to formally contest the application and issuance of the permit. Another owner later intervened, joining the opposition to issuance of the Dash 9 Permit.

During the ensuing administrative hearing conducted by a duly appointed ALJ from the Department of Administrative Hearings, the HOA presented the testimony of its expert who performed calculations of what the as-designed stormwater system could theoretically manage and concluded that it would function properly even if the impervious surface area percentage

within the development was increased to 44.28% from the originally permitted 38.06%. The HOA's expert had not based his calculations on the stormwater management system that currently, actually existed in Cedar Island nor had he considered the deviations from the system's design noted in the 2002 as-built plans. The objecting homeowners presented the testimony of their engineering expert who opined that one could not accurately calculate what water load and what percentage of impervious surfaces the Cedar Island stormwater system could handle unless the system's current status and the deviations from design were considered.

## Why Ignore the Obvious?

The evidence introduced at trial demonstrated that Cedar Island's existing stormwater management system was smaller than designed and originally permitted. That smaller system was already handling a larger load at that stage of development than anticipated, and it needed maintenance of all its features. Nobody provided calculations as to the ability of Cedar Island's current system to manage the existing stormwater runoff, nor did anybody provide calculations as to whether the current system could manage the proposed, increased load associated with the increased percentage of impervious surface areas.

In order to obtain the Dash 9 Permit, the HOA was required to provide "reasonable assurance" that the stormwater management system would satisfy the applicable criteria set forth in rule 62-330.301 and rule 62.330-302 of the Florida Administrative Code, and Volumes I and II of the Environmental Resource Permit Applicant's Handbook. "Reasonable assurance" has been defined as "a substantial likelihood that the project will be successfully implemented." *Metro. Dade Cty. v. Coscan Fla., Inc.,* 609 So. 2d 644, 648 (Fla. 3d DCA 1992). Reasonable assurance does not call for absolute guarantees, nor can proof of reasonable assurance be defeated solely by speculation or subjective concerns. *FINR II, Inc. v. CF Indus., Inc.,* Case No. 11-6495 (Fla. DOAH Apr. 30, 2012; Fla. DEP June 8, 2012).

Following the conclusion of the formal administrative hearing, the parties submitted proposed recommended orders and on May 2, 2022, the ALJ issued a recommended order.

<u>ALJ Recommends the District Deny the Dash 9 Permit</u>

Ultimately, the ALJ agreed with the objecting homeowners, finding that the HOA had not carried its burden of providing "reasonable assurance" that its proposal would comply with applicable rules. The ALJ cited to rule 62-330.301(1)(b), Florida Administrative Code, which requires that construction, operation, and maintenance of the project will not cause adverse flooding to

9

on-site or off-site property. The ALJ also cited to rule 62-330.301(1)(c), which requires that there be no "adverse impacts to existing surface water storage and conveyance capabilities." Although the HOA's expert testified that in his opinion there would be no such adverse consequences, the ALJ considered, but rejected those opinions due to "deficiencies in the modeling." The HOA's Dash 9 application was based on theoretical calculations of a system that did not exist at the time of the hearing, that had never existed, and that was not being proposed as new or modified construction now by the HOA. While the ALJ acknowledged the District's argument that the HOA *could* bring the system into compliance, it also noted that the HOA "never expressed any definitive intent that it would bring the system to its design specifications." Further, the ALJ stated in the recommended order that it was the responsibility of the applicant, not the District, to provide the requisite reasonable assurances.

Post-Hearing Proceedings

The parties filed exceptions to portions of the ALJ's recommended order which the District considered and ruled upon in its Final Order and Order of Remand. In that order, the District took exception to the ALJ's conclusion that calculations regarding the stormwater management system must be modeled based on its current condition, rather than the proposed

10

condition. The District and the HOA asserted that the ALJ improperly applied the analysis called for under rule 62-330.301(1)(a), (b) and (c) and that rule 62-330.302 was not at issue in this case.

To summarize the District's lengthy argument on this point, it noted that if there were issues of non-compliance or violations of the existing Dash 4 Permit, one should consider whether the proposed modifications would resolve those problems. However, the only modification proposed here was a new set of calculations. There was no proposal by the HOA to change the physical condition of any part of the existing system. There was no suggestion that the HOA had any intention of revising the as-built, non-compliant existing system so as to resemble the non-existent, as-designed system that its expert relied upon. As already noted, the HOA's expert never performed any calculations to determine if the current system could handle either the current or the proposed increased runoff load. A computer with software is no substitute for excavation equipment when it comes to making ponds that were too shallow 20 years ago—before being silted in—deep enough to comply with the original design that was permitted.

The District's order remanded the case to the ALJ, directing it to make findings of fact and conclusions of law based on the "proposed" project rather than on the "existing" system. In other words, the District remanded for the

11

ALJ to proceed on the assumption that the stormwater management system in question was the one described in the 2001 design plan that was originally permitted. The District stated that with any permit application, you don't look at the current condition because typically the application is for a "proposed system" that is going to be built or the physical modification of an existing system. Here, there was no such "proposed system."

The District's remand order included a hypothetical situation in which an applicant's current system was in place and was independently permittable, despite the fact that the current system, as built, did not comply with the design submitted and originally permitted. In its hypothetical, the District bemoans that this hypothetical applicant would have to deconstruct its existing, desirable stormwater system, that was demonstrated to be permittable, just to comply with the original permit. Of course, that hypothetical situation has nothing to do with this case, because the HOA never attempted to demonstrate that its current system, as-built rather than as-designed, would be eligible for permitting. The HOA's expert prepared no calculations as to whether Cedar Island's existing system would be permittable. Thus, the District's hypothetical fact pattern underscores why the Dash 9 Permit should be denied here as there were no reasonable

12

assurances of any existing or proposed system that was going to be constructed at Cedar Island that would be permittable.

## ALJ's Ruling on Remand

The ALJ issued an order following remand in which the remand order was acknowledged, but the ALJ declined to accept the District's premise that the application for the Dash 9 Permit was to be considered as though the non-existent, never-existing system designed in 2001 was in place. The ALJ further rejected the District's directive that the ALJ consider the application as though the 2001 as-designed system would be put in place at some indeterminate time, because the HOA had not proposed to do so. The HOA was just doing a numbers submission of recalculations based on the as-designed system, not the as-built, much less the current system. Thus, the ALJ did not reject the remand; however, there was no "proposed project" which could be analyzed in accordance with the remand order.

## Current Appellate Review

The District and HOA sought appellate review from this Court. Section 120.68(1)(b), Florida Statutes (2022), provides:

> A preliminary, procedural, or intermediate order of the agency or of an administrative law judge of the Division of Administrative Hearings is immediately reviewable if review of the final agency decision would not provide an adequate remedy.

13

The scope of appellate review under that provision is "'analogous to, and no broader than the right of review by common law certiorari.'" *CNL Resort Hotel, L.P. v. City of Doral,* 991 So. 2d 417, 420 (Fla. 3d DCA 2008) (quoting *Fla. Dep't of Fin. Servs. v. Fuggett*, 946 So. 2d 80, 81 (Fla. 1st DCA 2006)). "On certiorari review, a petitioner must demonstrate that the lower court 'departed from the essential requirements of the law, thereby causing irreparable injury which cannot be adequately remedied on appeal following final judgment.'" *Id*. (quoting *Belair v. Drew*, 770 So. 2d 1164, 1166 (Fla. 2000)). If a decision following remand by an ALJ leaves the parties at an impasse, the appellate court must resolve the issue because there is no other remedy. *See Ag. for Health Care Admin. v. Mount Sinai Med. Ctr. of Greater Miami*, 690 So. 2d 689, 693 (Benton, J., concurring) ("With the Administrative Law Judge (ALJ) within the Division of Administrative Hearings (DOAH) and the Agency for Health Care Administration (AHCA) at an impasse, the litigants have no other forum.").

The District and the HOA assert that this Court has jurisdiction because the Agency cannot issue a final order on whether to issue the Dash 9 Permit, given that the ALJ's Second Order does not make the additional factual findings requested by the District. At issue is whether the ALJ's Second Order departs from the essential requirements of the law resulting in

14

irreparable harm in the form of a "stalemate" that leaves the parties at an impasse, as alleged by the District and the HOA.

<u>No Departure from the Essential Requirements of Law</u>

The ALJ, in the initial recommended order and the order following remand, was required to base findings of fact and conclusions of law on competent, substantial evidence. In both orders, the ALJ determined that Cedar Island had not proved that the existing stormwater management system met the requirements for issuance of the Dash 9 Permit. The District acknowledged in its remand order that the ALJ had made those findings and they were supported by competent, substantial evidence.

The permit application that the District wants the ALJ to reconsider simply does not exist. The District's remand order to the ALJ and its arguments before this Court assume one of two things: (1) that the HOA has proposed in its Dash 9 Permit application to construct or modify its existing system to bring it into compliance with the original design and original permit, or (2) that Cedar Island's exiting stormwater management system can be permitted without change. But neither circumstance exists. The HOA did not propose in its application to bring the existing system into compliance with the original design or to construct an otherwise permittable system. Thus, there simply was no "proposed system" for the ALJ to consider as an

15

alternative to Cedar Island's existing system. The HOA included its as-built plans which demonstrated beyond dispute that the existing system did not replicate the system as designed and the HOA knew it. Accordingly, there was no departure from the essential requirements of the law when the ALJ did not make findings of fact regarding any "proposed system" and concluded that the HOA, which offered no evidence about its current system, had neither proposed any construction nor provided reasonable assurance that the existing system could handle an increased percentage of impervious surfaces.

<u>No Stalemate and No Irreparable Harm</u>

The District and HOA argue that unless we remand the matter to the ALJ with instructions to make the findings of fact relating to the non-existent "proposed system," the District will be unable to issue a final order. That is not correct. As the record stands now with the findings of the ALJ, the District can enter its final order either granting or denying the HOA's Dash 9 Permit. What the District cannot do in the proceeding before this Court is to have the case remanded for the ALJ to consider an application in a form and with information that was never submitted and to render findings of fact and conclusions of law on evidence that was not offered during the formal administrative hearing.

16

The HOA has argued that the matter could be remanded for additional presentation of evidence regarding whether its existing stormwater management system can effectively handle not only the current stormwater load, but the increased load that would result by increasing the percentage of impervious surfaces. Overlooking the fact that the HOA did not make that proposal in its application nor in the underlying case, that would require reopening the case with additional evidence presented by the HOA, the District, and the objecting homeowners. It would require further hearings, a further recommended order from the ALJ, further exceptions from the parties, and perhaps would cumulate in a final order from the District which would still be subject to an appeal. That untenable situation was perfectly described as "endless litigation" which the First District observed was not the intent of the Administrative Procedures Act. *See Fla. Dep't of Transp. v. J.W.C. Co.,* 396 So. 2d 778, 784 (Fla. 1st DCA 1981). The HOA here made the choice to offer recalculations only and has never proposed to either bring its existing system into compliance with the original design or offer reasonable assurance that its current system is permittable.

## Conclusion

Accordingly, we deny the District and the HOA's petition, and remand to the District for entry of a final order either issuing or denying the HOA's

17

application for the Dash 9 Permit, which Agency decision can then be appealed if the losing parties choose to do so.

MOTION GRANTED, PETITION DENIED; REMANDED TO THE AGENCY WITH INSTRUCTIONS.

LAMBERT and HARRIS, JJ., concur.